1
2
3
4
5
6
7            UNITED STATES DISTRICT COURT

8              EASTERN DISTRICT OF CALIFORNIA

9

| | |
|---|---|
| MILDRED CARTER, | 1:07-cv-00045-LJO-SMS |
| Plaintiff, | FINDINGS AND RECOMMENDATIONS RE: |
| v. | PLAINTIFF'S SOCIAL SECURITY |
| | COMPLAINT (DOCS. 1, 24) |
| MICHAEL J. ASTRUE, | |
| Commissioner of Social | |
| Security, | |
| Defendant. | |

     Plaintiff is represented by counsel and is proceeding in

forma pauperis with an action seeking judicial review of a final

decision of the Commissioner of Social Security (Commissioner)

denying Plaintiff's application for a period of disability,

disability insurance benefits (DIB), and supplemental security

income (SSI) benefits under Titles II and XVI of the Social

Security Act (Act). The matter has been referred to the

Magistrate Judge pursuant to 28 U.S.C.§ 636(b) and Local Rule 72-

302(c)(15). The matter is currently before the Court on the

parties' briefs, which have been submitted without oral argument

to the Honorable Sandra M. Snyder, United States Magistrate

Judge.

1    I. <u>Procedural History</u>

2        Plaintiff, who was born in August 1967 and who was thirty-
3    eight years old on the date of the decision in question,
4    previously received DIB and SSI benefits, but it was determined
5    that her entitlement to DIB and eligibility for SSI ended on July
6    31, 2002, the end of the second calendar month after the month in
7    which disability ceased. (A.R. 27, 29.)[1]

8        On December 3, 2003, Plaintiff filed applications for DIB
9    and SSI, alleging disability as of September 5, 2003, due to pain
10   in the hips, legs, and back, and later due to diabetes and
11   depression. (A.R. 83-85, 392-95, 28.) After Plaintiff's claim was
12   denied initially and on reconsideration, Plaintiff requested, and
13   appeared at, a hearing before the Honorable William C. Thompson,
14   Jr., Administrative Law Judge (ALJ) of the Social Security
15   Administration (SSA), on February 14, 2006. Plaintiff appeared
16   with an attorney and testified. (A.R. 27.) On June 13, 2006, the
17   ALJ denied Plaintiff's application for benefits. (<u>Id.</u> at 27-38.)
18   Plaintiff appealed the ALJ's decision to the Appeals Council.
19   After the Appeals Council denied Plaintiff's request for review
20   on November 3, 2006, Plaintiff filed the complaint in this action
21   on January 6, 2007. (<u>Id.</u> at 6-8.) Briefing commenced on December
22   17, 2007, and was completed with the filing on January 28, 2008,
23   of Plaintiff's reply to Defendant's opposition.

24   II. <u>Standard and Scope of Review</u>

25       Congress has provided a limited scope of judicial review of
26   the Commissioner's decision to deny benefits under the Act. In

27

28       [1] References to the administrative record are denoted interchangeably by "A.R." or "Tr."

2

1  reviewing findings of fact with respect to such determinations,
2  the Court must determine whether the decision of the Commissioner
3  is supported by substantial evidence. 42 U.S.C. § 405(g).
4  Substantial evidence means "more than a mere scintilla,"
5  Richardson v. Perales, 402 U.S. 389, 402 (1971), but less than a
6  preponderance, Sorenson v. Weinberger, 514 F.2d 1112, 1119, n. 10
7  (9th Cir. 1975). It is "such relevant evidence as a reasonable
8  mind might accept as adequate to support a conclusion."
9  Richardson, 402 U.S. at 401. The Court must consider the record
10 as a whole, weighing both the evidence that supports and the
11 evidence that detracts from the Commissioner's conclusion; it may
12 not simply isolate a portion of evidence that supports the
13 decision. Robbins v. Soc. Sec. Admin., 466 F.3d 880, 882 (9th Cir.
14 2006); Jones v. Heckler, 760 F.2d 993, 995 (9th Cir. 1985).
15 It is immaterial that the evidence would support a finding
16 contrary to that reached by the Commissioner; the determination
17 of the Commissioner as to a factual matter will stand if
18 supported by substantial evidence because it is the
19 Commissioner's job, and not the Court's, to resolve conflicts in
20 the evidence. Sorenson v. Weinberger, 514 F.2d 1112, 1119 (9th
21 Cir. 1975).

22      In weighing the evidence and making findings, the
23 Commissioner must apply the proper legal standards. Burkhart v.
24 Bowen, 856 F.2d 1335, 1338 (9th Cir. 1988). This Court must
25 review the whole record and uphold the Commissioner's
26 determination that the claimant is not disabled if the
27 Commissioner applied the proper legal standards, and if the
28 Commissioner's findings are supported by substantial evidence.

1   See, Sanchez v. Secretary of Health and Human Services, 812 F.2d

2   509, 510 (9th Cir. 1987); Jones v. Heckler, 760 F.2d at 995. If

3   the Court concludes that the ALJ did not use the proper legal

4   standard, the matter will be remanded to permit application of

5   the appropriate standard. Cooper v. Bowen, 885 F.2d 557, 561 (9th

6   Cir. 1987).

7        III. Disability

8        In order to qualify for benefits, a claimant must establish

9   that she is unable to engage in substantial gainful activity due

10  to a medically determinable physical or mental impairment which

11  has lasted or can be expected to last for a continuous period of

12  not less than twelve months. 42 U.S.C. §§ 416(i), 1382c(a)(3)(A).

13  A claimant must demonstrate a physical or mental impairment of

14  such severity that the claimant is not only unable to do the

15  claimant's previous work, but cannot, considering age, education,

16  and work experience, engage in any other kind of substantial

17  gainful work which exists in the national economy. 42 U.S.C.

18  1382c(a)(3)(B); Quang Van Han v. Bowen, 882 F.2d 1453, 1456 (9th

19  Cir. 1989). The burden of establishing a disability is initially

20  on the claimant, who must prove that the claimant is unable to

21  return to his or her former type of work; the burden then shifts

22  to the Commissioner to identify other jobs that the claimant is

23  capable of performing considering the claimant's residual

24  functional capacity, as well as her age, education and last

25  fifteen years of work experience. Terry v. Sullivan, 903 F.2d

26  1273, 1275 (9th Cir. 1990).

27       The regulations provide that the ALJ must make specific

28  sequential determinations in the process of evaluating a

4

disability: 1) whether the applicant engaged in substantial
gainful activity since the alleged date of the onset of the
impairment, 20 C.F.R. § 404.1520 (1997);[2] 2) whether solely on the
basis of the medical evidence the claimed impairment is severe,
that is, of a magnitude sufficient to limit significantly the
individual's physical or mental ability to do basic work
activities, 20 C.F.R. § 404.1520(c); 3) whether solely on the
basis of medical evidence the impairment equals or exceeds in
severity certain impairments described in Appendix I of the
regulations, 20 C.F.R. § 404.1520(d); 4) whether the applicant
has sufficient residual functional capacity, defined as what an
individual can still do despite limitations, to perform the
applicant's past work, 20 C.F.R. §§ 404.1520(e), 404.1545(a); and
5) whether on the basis of the applicant's age, education, work
experience, and residual functional capacity, the applicant can
perform any other gainful and substantial work within the
economy, 20 C.F.R. § 404.1520(f).

    With respect to SSI, the five-step evaluation process is
essentially the same. See 20 C.F.R. § 416.920.

    Here, the ALJ found that Plaintiff had severe impairments of
status post-pin placement in the hips and obesity. (Tr. 37.) She
did not have an impairment or combination of impairments that met
or equaled the criteria in 20 C.F.R. Pt. 404, Subpt. P, App. 1
(the Medical Listings). (Tr. 37.) She retained the ability to
perform a wide range of light work. Specifically, the ALJ found
that she had the residual functional capacity (RFC) to lift and

---

[2] All references are to the 2006 version of the Code of Federal Regulations unless otherwise noted.

1  carry twenty pounds occasionally and ten pounds frequently,
2  stand and walk for six hours in an eight hour workday, but could
3  not climb ladders, ropes, or scaffolds, could not operate foot
4  controls, and must avoid heights and dangerous moving machinery.
5  (Tr. 37.) Using Rules 202.21 and 202.22 as a framework for
6  decision, the ALJ found that she was capable of performing other
7  work within the national economy, namely, cashier, assembler, and
8  laundry worker, and thus was not disabled. (Tr. 37, 23.)

9      IV. <u>Summary of Medical Records</u>

10     In October 2002, Dr. Joy Farley of the Health Services
11  Agency examined Plaintiff and diagnosed morbid obesity; she
12  recommended weight loss and that Plaintiff look into the YMCA for
13  aqua aerobics. (A.R. 236.) In December 2002, Dr. Farley continued
14  medications and recommended an exercise program, keeping a food
15  diary, and physical and occupational therapy. (A.R. 234.)

16     In March 2003, Plaintiff experienced pain from her hip
17  condition, and physical therapy had exacerbated it. Treating
18  orthopedist Dr. Pistel examined Plaintiff as well as x-rays that
19  revealed pins in place from a previous surgery with heterotopic
20  bone over the proximal femur on the lateral side covering the
21  pins completely, without any pin protrusion or evidence of
22  chondrolysis, flattening of the head, or destructive arthritis.
23  (A.R. 319.) At age eleven, Plaintiff had been diagnosed with a
24  slipped capital femoral epiphysis, which was treated with pinning
25  in both hips in 1976; in 1996, an attempt to retrieve the pins
26  was made, but it was unsuccessful and brought no relief.
27  Plaintiff had pain to palpation in the lumbosacral region, point-
28  tenderness at the sacroiliac joint, and limited spinal motion,

side bending, and rotation because of pain. She had very limited
range of motion in the hip. There was no examination of the
sciatic nerve because it was not tolerated; she did not have
groin pain with full range of motion, and there was no crepitus.
(A.R. 319.)   He informed Plaintiff that the potential causes of
her low back and hip pain were the previous hip surgery, which
could have changed her joint mechanics, and her abdominal girth,
which was causing the spine to go into lordosis and a pain
pattern; he recommended epidural anesthesia to start with
followed by a careful diet and physical therapy program,
including aqua therapy. He stated that he had made it very clear
to her that he thought that a very important aspect of her
treatment would be weight loss in order to improve her symptoms
for both her low back but also for prevention of total hip
arthroplasty in both hips. His impression was status post SCIFE
with mechanical low back pain and facet arthritis (A.R. 319.)

In May 2003, Dr. Pistel examined Plaintiff, who reported
that when she was in hydrotherapy, her symptoms abated; Dr.
Pistel concluded that this showed that the vast majority of her
problems were low back-related, and he recommended back
strengthening, fitness program, continued medication, and
exercise. (A.R. 318.) Plaintiff reported to Dr. Farley in May
2003 that she had started pool therapy after having seen Dr.
Pistel, and she felt better; Plaintiff had obtained a TENS unit
three months earlier. (A.R. 217.)

Plaintiff reported increasing hip pain and continued back
pain in July 2003, and Dr. Pistel directed Plaintiff to continue
with physical therapy to improve the back, and to avoid hip

1  replacement as long as possible. (A.R. 317)

2      On September 22, 2003, Dr. Pistel saw Plaintiff again after

3  an epidural injection had only provided Plaintiff with short,

4  minimal relief. Dr. Pistel reported:

5      I feel that her body habitues and size will continue to
       contribute to chronic low back and hip pain, although

6      her degenerative hip problem as a young woman will
       continue to bother her.

7      I have thusly recommended that prior to any consideration
       for a total hip replacement at her young age and size, that

8      we get a second opinion. I will ask Dr. Rajagopalan to see
       her to give her his opinion regarding the time frame

9      of hip replacement. I suggested to the patient that over
       the long-term, her success diminishing symptoms will

10     lye (sic) in weight reduction and management of this as
       well as conditioning. She does seem to get good relief

11     when she does aqua therapy and that should continue also.

12  (A.R. 316.)

13      In October 2003, Dr. Bal M. Rajagopalan reviewed Plaintiff

14  in clinic and opined that she had hip pain bilaterally with mild

15  degenerative changes, subsequent to her size and inflammation

16  from her load of her hip; because the hips were a very concentric

17  joint, a little bit of changes with increased load would cause

18  significant symptoms. Plaintiff would be a candidate for a hip

19  replacement, but at the time of the clinic, treatment by

20  injections would be therapeutic and diagnostic. (A.R. 315.)

21      Dr. Farley discussed a food and exercise diary with

22  Plaintiff in October 2003. (A.R. 213.) In December 2003, Dr.

23  Farley noted that Plaintiff's disability was pending appeal; the

24  doctor encouraged weight loss and continuing pool therapy three

25  time a week; she noted that obesity was contributing to

26  Plaintiff's back pain and arthritis, and that Plaintiff had lost

27  weight (twenty pounds) for the first visit, and she was

28  encouraged to continue. (A.R. 212.)

1    On November 7, 2003, Dr. Pistel wrote to the Stanislaus

2 Orthopaedic and Sports Medicine Clinic regarding Plaintiff. He

3 wrote that she had "significant arthritic change coccymagna" as a

4 result of slipped capital epiphysis; she would need a total joint

5 replacement but should wait as long as possible because of her

6 young age (thirty-six); he opined that due to her medical

7 condition, any type of activity or work would be impossible for

8 her. (A.R. 311.)

9    In January 2004, Dr. Pistel noted that Plaintiff had not

10 gotten much relief from the injection of her hip. He encouraged

11 Plaintiff to continue her exercises to delay a total hip

12 arthroplasty as long as possible. (A.R. 309). Plaintiff continued

13 to try to lose weight in April 2004. (A.R. 308.)

14    In April 2004, Dr. Farley recommended enrolling Plaintiff

15 again in the obesity class at Paradise and continuing pool

16 exercises. (A.R. 207.) Dr. Pistel noted that Plaintiff continued

17 to try to lose weight. (A.R. 308.) In May 2004, Dr. Pistel noted

18 there was no bone-on-bone arthritis of the hip; prior to total

19 hip replacement, Dr. Pistel recommended surgery to attempt to

20 remove the hardware. (A.R. 307.)

21    Plaintiff, who was taking medication and was prescribed

22 physical therapy, was referred to the pain clinic and was

23 examined in June 2004. An x-ray revealed normal hip joint space,

24 bone spurs over pins on the left side with a protruding pin and

25 the appearance of some broken pieces. Plaintiff reported doing

26 water therapy since 1997 about three times a week, which she

27 reported was somewhat helpful. (A.R. 349.) The diagnosis was

28 chronic hip pain likely worsened secondary to bone spurs from

protruding pins. (A.R. 350.) Medications and physical therapy were to continue, and surgery was scheduled. (A.R. 349-50.)

In December 2004, Dr. Pistel reported that surgery had shown that Plaintiff's three pins were deeply embedded in the bone. The portion of the pins that protruded from the bone was removed; the remainder of the pins had broken deep inside the bone, and bone spurs that were present were smoothed. Dr. Pistel prescribed physical therapy. (A.R. 348, 371.)

In February 2005, Dr. Pistel noted Plaintiff's continuing complaints of pain; he recommended continuing exercise and lifestyle change in order to lose weight, and weaning her off narcotics and muscle relaxants during the day and pain medication at night over the next several months. He did not feel that she would need hip replacement surgery. (A.R. 347.) During Plaintiff's February 2005 visit to the pain clinic, she reported that she had been doing pool therapy as physical therapy, but she had stopped in October 2004. (A.R. 345.) She complained of constant low back pain that radiated down both legs. (Id.) The doctors recommended continuing pool therapy and working out in the gym, stretches, aerobic exercise, increasing activity, and losing weight. (A.R. 346.)

In March 2005, Dr. Pistel recommended continuing her exercise program and talking with another doctor about gastric bypass as a way to help. (A.R. 340.) Notes from Plaintiff's visit to the pain clinic that month reflect that Plaintiff complained of worsening pain but reported an increased level of activity or exercise consisting of one half hour of exercise two or three times a week in an arthritis water class, with one-half hour of

floating. Her exercise was walking, squats, and abductions in the water, and floating in the water; she did no exercise in the gym or with equipment. Her compliance was rated as fair and average; she was instructed as to motivation and given a home program in which she was to perform step-up's, increased land exercise, and stretching. (A.R. 344.)

In April 2005, EMG studies of both Plaintiff's lower extremities, performed to evaluate possible peripheral neuropathy or lumbosacral radiculopathy, were normal. (A.R. 341-43.) Plaintiff reported that the EMG had revealed spinal stenosis; Dr. Pistel opined that Plaintiff presented a clinical picture that was consistent, so Plaintiff was referred to Dr. Gadgil, and Dr. Pistel ordered an MRI and a neurosurgery referral. (A.R. 339.)

In May 2005 Dr. Pistel recommended continuing to exercise and lose weight, and injections to delineate the pain. (A.R. 335.) He treated her with a forearm strap, physical therapy, and rest for pain at the medial epicondyle. (A.R. 338.) He recommended that she progress out of the water exercises, and the plan was to taper her slowly off her Elavil and possibly increase Flexeril; the plan also included continuing a weight loss diet (Plaintiff weighed 330 pounds). (A.R. 337.)

At the pain clinic in May 2005, Plaintiff reported that her pain had increased and her activity and exercise level were worse; she was doing water exercise; unspecified "P.T." that she did at home did not help. A physical exam revealed tenderness over the trochanter and reduced movement of the back with possible poor effort. The summary "REPORT CARD" stated that Plaintiff was difficult to motivate, dependent, had a passive

1  attitude, was on several pain medications, and made poor

2  progress. (A.R. 337.)

3      In July 2005, Dr. Pistel advised diagnostic and therapeutic

4  injections under fluoroscopy to help delineate Plaintiff's hip

5  pain, as well as continuing trying to exercise and lose weight,

6  which would also help delineate whether the pain was coming from

7  the low back or from the hip. Dr. Pistel also injected both hips

8  and the greater trochanteric region and right elbow, and the plan

9  was to continue physical therapy. (A.R. 335.) He recommended an

10  intra-articular hip injection bilaterally. (A.R. 334.) He

11  injected Marcaine and Depo-Medrol into both hips on August 4,

12  2005. (A.R. 377.) His postoperative diagnosis was bilateral hip

13  pain with possible degenerative joint disease. (A.R. 375.)

14  Plaintiff was discharged with instructions to return to previous

15  activities gradually. (A.R. 373.)

16      A note reflects studies taken during surgery on August 4,

17  2005, including a study of one view of the right hip, reflected

18  retained hardware, with a needle overlying the left femoral head,

19  and multiple pieces of hardware. The impression was postoperative

20  changes, and needle over the femoral head. (A.R. 380.) A study of

21  the left hip showed retained hardware in surgery and a needle and

22  multiple pins in place; there was no change from the prior exam

23  of December 2004. (A.R. 379.)

24      On August 11, 2005, Plaintiff reported to the pain clinic

25  that her pain was constant and was worse, and her exercise or

26  activity level was also worse, with one block of walking causing

27  bilateral pain; she stretched five to ten times a day, but it

28  hurt worse; she stopped physical therapy and swimming three weeks

1  earlier; she had been going three times a week to physical
2  therapy, but it brought no relief. There was tenderness over the
3  lower back, worse on the left, right and left buttocks were
4  painful when palpated, hip flexion was thirty degrees left and
5  forty-five degrees right. The plan was to resume swimming and
6  walking and stretching at home with gradual increase in intensity
7  and frequency. (A.R. 333.)

8      An MRI taken August 11, 2005, revealed a small central bulge
9  at the level of L5-S1 that caused mild compression of the thecal
10  sac without evidence of nerve root compression, and with
11  associated mild facet joint arthropathy (A.R. 333, 387.)

12      In August 2005, Plaintiff's physical therapist reported that
13  with respect to Plaintiff's prescription from Dr. Pistel for
14  therapy for back and bilateral hip pain, Plaintiff had only
15  attended twice (two consecutive appointments in July 2005), and
16  she stated that she was waiting to see what her doctor would tell
17  her to do in response to therapy. (A.R. 336.)

18      On September 27, 2005, Plaintiff was evaluated at the
19  Neurosurgical Clinic of the Stanislaus County Health Services
20  Agency by Dr. Dikran Bairamian. (A.R. 328-39.) Dr. Bairamian
21  found unlimited straight leg raising, tenderness of the lower
22  lumbar region, hip rotation uncomfortable on the left, and 5/5
23  motor exam with normal sensory exam. X-rays showed minimal
24  degenerative changes at L5-S1; he saw no cauda equina or root
25  compression. His impression was back/bilateral lower extremity
26  pain. He told Plaintiff that surgical intervention on the spine
27  was not indicated. She was referred for a course in physical
28  therapy in addition to an epidural block; she was advised to lose

13

weight and to follow up with her primary care physician. (A.R. 329.)

At the pain clinic in October 2005, Plaintiff reported worse pain and activity level; she was not doing the home exercise program, anticipated restarting, and was scared about restarting because of prior episodes and pins extruding after physical therapy. She took Methadone, Elavil, Flexeril, Vasotec, Paxintine, and Glucophage. The physical exam revealed reduced range of motion at the waist, tenderness to palpation diffusely throughout back, arms, and legs, slow gait but no limp, a minimal squat, twenty degrees flexion, ten degrees lateral bending, and five degrees extension. The TENS unit helped somewhat with pain in the back, buttocks, and the inside of the legs. Plaintiff's sleep was poor despite her dose of 120-150 milligrams of Elavil. Plaintiff was difficult to motivate. Physical therapy (pool exercises/therapy three times a week) was scheduled, and Plaintiff was advised to attend, but it was not clear that she would go. She was encouraged to continue to try to reduce her dose of Elavil and to attend weight loss class. (A.R. 327.)

In December, Dr. Pistel saw Plaintiff, who complained of continued hip pain; Dr. Pistel planned that before considering hip replacement surgery, a second trial injection should be given. He would discuss a new hip in the following year. (A.R. 325.)

Plaintiff visited the emergency department of Doctor's Medical Center on December 22, 2005, for bilateral hip pain. (A.R. 365-66.) Dr. Robert E. Wolfensperger examined Plaintiff and found full range of motion at both hips, well-healed bilateral

lateral scars, and no evidence of thrombophlebitis, cellulitis, or abscess formations. He noted that the x-rays showed multiple pins at both hips with normal bony prominences; one of the four pins at the left hip was bent at the tip and the other had several small chips out of it, but there was no foreign material in the wound or any free-floating metallic foreign bodies. The impression was bilateral hip pain with multiple pins, and medication. (Id.) Dr. Matthew Lynn reported that a study of Plaintiff's left hip and pelvis showed multiple pins fixing bilateral femoral neck fractures; no acute fractures were seen; there was some minimal osteoarthritic change in the hips, but no lytic or destructive lesions were seen. (A.R. 367.)

In January 2006, Plaintiff weighed 315 pounds. (A.R. 324.) Dr. Pistel stated that Plaintiff had bilateral hip arthritis as a result of her Legg-Calve-Perthes,[3] and she would have a bilateral hip injection under fluoroscopy. (A.R. 323.) The injection was performed on January 26, 2006. (A.R. 358-59.) Dr. Pistel noted that three to six months before, Plaintiff had had a positive response to injection of the hips and was there for a repeat injection. (A.R. 356.) Plaintiff exhibited pain with range of motion and in the groin. (Id.)

Two weeks after the hearing, on February 20, 2006, Dr. Pistel opined[4] that due to multiple musculoskeletal problems, continued pain in both legs and low back, with significant

---

[3]Legg-Calve-Perthes disease is osteochondrosis of the capitular epiphysis of the femur. Dorland's Illustrated Medical Dictionary, (28th ed. 1994) p. 485.

[4] The ALJ adverted to and evaluated the post-hearing opinions of treating Drs. Pistel and Gadgil (A.R. 35) without reference to their timing; thus, the Court's includes them in its review of the ALJ's decision.

arthritic change "coccymagna" resulting after slipped capital
epiphysis, Plaintiff was precluded from performing any full-time
work at any exertional level, including sedentary work; she could
sit about an hour and stand and/or walk thirty minutes total. He
opined that she was really disabled. (A.R. 390.)

Also after the hearing, on February 23, 2006, Dr. Gadgil,
Plaintiff's primary physician, opined that since September 2004,
Plaintiff was precluded from performing any full-time work at any
exertional level, including sedentary work, due to hip pain and
lower back pain that radiated bilaterally to the lower
extremities due to slipped capital femoral epiphysis, along with
a small disc bulge at L5-S1 as reflected by the August 2005 MRI;
she could sit thirty minutes to an hour, and stand or walk
fifteen to twenty minutes; periodically she needed to elevate her
legs and lie down to help with her back pain for two hours; she
was also unable to squat, lift her arms above her head, and
constantly needed to change position. (A.R. 391.)

Exhibits presented to the Appeals Council reflect later
treatment of Plaintiff.

A partial copy of a letter to Plaintiff's doctor from UCSF
Medical Center dated March 29, 2006, and a copy of a letter from
May 2006 from Dr. Vedat Deviren, referred to examination of
Plaintiff, who weighed 310 pounds and reported that her three
injections into the hips had no particular benefit; she had tried
physical therapy and other treatment but believed her condition
to be worsening. She experienced severe pain (ten on a scale of
one to ten) in the hips, the groin, and over the side that was
present with all activities and positions. She could walk only

1  from her bed to her chair without pain. She experienced
2  stiffness, numbness, swelling, and weakness, and she had a
3  moderate limp. She was morbidly obese. She took Methadone for
4  pain control. Physical examination revealed normal limb alignment
5  between hip and ankle, normal neurovascular status in both
6  extremities distally when sitting; painful straight leg raising
7  in the supine position; and limited range of motion of the hips
8  with pain. The knees were in apparent valgus. Examination of the
9  right hip showed flexion to ninety degrees, extension of zero
10 degrees, and internal rotation of zero degrees causing
11 significant pain; external rotation was to forty degrees,
12 abduction thirty, and adduction of twenty; examination of the
13 left hip showed eighty-five degrees of flexion, zero degrees of
14 extension, zero degrees of internal rotation accompanied by
15 significant pain, forty degrees of external rotation, twenty-five
16 degrees of abduction, and fifteen degrees of adduction, all
17 accompanied by pain. (A.R. 404-07.) X-rays taken of both hips
18 demonstrated reasonably well preserved joint spaces bilaterally
19 and residuals of mild slipped femoral capital epiphysis with
20 retained pins; early signs of impingement and osteophytosis on
21 the right, and a possible early osteophyte at the superior border
22 of the acetabulum; lateral views of the hips showed the pins to
23 be within the femoral neck and head, and the hip joint spaces
24 were fairly well maintained bilaterally. X-rays of the
25 lumbosacral spine showed some degeneration of the L5-S1 disc
26 space but otherwise decent alignment; a previous nuclear bone
27 scan demonstrated focal increase at her bilateral sacroiliac
28 joints and on the left side at L5-S1. The diagnosis was bilateral

17

1 coccydynia status post-pinning for slipped femoral capital
2 epiphysis as a child. The impression was that it was not clear
3 whether the pain was due to arthritis of the hip joints, was
4 coming from her spine, or had some other origin. (A.R. 405.) Dr.
5 Deviren concluded that surgery would not be beneficial at that
6 time, but weight loss and walking more, along with pain
7 management, would benefit her. (A.R. 407.)

8      A report of a bone scan, with intravenous administration of
9 TC-99m MDP, of the pelvis taken April 17, 2006, revealed no
10 abnormal radiotracer activity in the femoral heads or other
11 portions of the hip joints to suggest osteomyelitis; there was a
12 small focus of uptake in the lower lumbar spine on the left at
13 L5-S1, and a slight amount of uptake in the bilateral sacroiliac
14 joints, possibly relative to degenerative disease. (A.R. 409.)

15      Dr. John Chase, a clinical instructor in the division of
16 arthroplasty at the department of orthopedic surgery at UCSF,
17 wrote on April 19, 2006, that a technetium bone scan performed on
18 April 17, 2006, revealed no abnormalities in the hip joints,
19 there was increased radiotracer uptake at L5-S1 on the left and
20 in both sacroiliac joints that was probably related to
21 degenerative disease, and a subtle fossa of activity in the lower
22 anterior chest wall possibly at the costochondral junctions. It
23 did not appear that Plaintiff's complaints were referable to her
24 hip joints; they were more likely emanating from her spine and/or
25 sacroiliac joints. She was referred to Dr. Deviren in the Spine
26 Clinic at UCSF for evaluation and treatment; Plaintiff was not a
27 candidate for arthroplasty of either hip despite her history, and
28 there was no significant degree of osteoarthritis of either hip

1    to suggest a need for surgery in the foreseeable future. Weight

2    loss would be of value in prolonging the life of Plaintiff's hip

3    joints. (A.R. 408.)

4         V. <u>Res Judicata</u>

5         Plaintiff argues that the ALJ erred in applying res judicata

6    to the previous finding of nondisability because Plaintiff was

7    not represented by counsel in the earlier hearing. The ALJ should

8    have evaluated all the evidence <u>de novo</u> instead of applying a

9    presumption of non-disability that Plaintiff had to overcome.

10        The Court agrees with Defendant that there was no improper

11   application of general principles of res judicata. The Court has

12   considered the governing legal principles. It is recognized that

13   final findings of nondisability made by an administrative law

14   judge require a claimant who reapplies to prove changed

15   circumstances to overcome a presumption of continuing

16   nondisability. <u>Chavez v. Bowen</u>, 844 F.2d at 693-94 (finding that

17   a change in age status was a changed circumstance that precluded

18   application of res judicata to a first ALJ's ultimate finding of

19   nondisability, recognizing some res judicata consideration to the

20   first ALJ's findings concerning RFC, education, and work

21   experience, and remanding for determination of a factor

22   [transferable work skills] needed to determine disability in

23   light of the prior findings and the new advanced age factor). A

24   finding of nondisability creates a presumption that the claimant

25   is capable of substantial gainful employment which may be

26   overcome if the claimant proves the existence of changed

27   circumstances that would establish disability. <u>Light v. Social</u>

28   <u>Security Administration</u>, 119 F.3d 789, 791-92 (9th Cir. 1997)

1 (concluding that upon introducing evidence that a previous
2 impairment had become increasingly severe, and evidence of
3 diagnosis of a new impairment, either of which could have been a
4 basis for a finding of disability either independently or when
5 aggregated with all of the claimant's pre-existing infirmities,
6 the applicant satisfied his burden of overcoming the presumption
7 that he was capable of work).

8   In Lester v. Chater, 81 F.3d 821, 827-28 (9th Cir. 1996), the
9 court stated that res judicata was not to be applied where the
10 claimant was unrepresented by counsel at the time of the prior
11 claim (citing Gregory v. Bowen, 844 F.2d 664, 666 (9th Cir.
12 1988)). There is no indication that the prior proceeding in
13 Lester involved an unrepresented claimant; the court did not rely
14 on the absence of counsel in the previous proceeding in
15 determining that res judicata should not be applied, and it
16 appears that at some stage of the proceedings, the applicant had
17 counsel. Id. at 828, 832. Indeed, the court in Lester determined
18 that res judicata should not apply because the claimant alleged a
19 new impairment that was not raised or addressed in the earlier
20 proceeding, and there was also an age change that affected
21 application of the medical-vocational guidelines and the
22 consideration of vocational factors. Id. at 828.

23   The court in Lester cited Gregory v. Bowen, 844 F.2d 664,
24 666 (9th Cir. 1988), where the question was whether a 1981 agency
25 decision on an earlier application that rejected the claimant's
26 application for benefits should be given res judicata effect. The
27 court determined that the later ALJ's decision, rendered in the
28 proceeding before it, to reopen the 1981 claim by considering on

1 the merits the issue of the claimant's disability during the time
2 covered by the 1981 decision "precludes agency reliance upon res
3 judicata." Id. at 666. Further, the court stated that because the
4 later application raised a new issue of psychological
5 impairments, it would inappropriate to apply res judicata. Id.
6 However, in discussing the doctrine of res judicata, the court
7 noted that the claimant had not been represented by counsel when
8 she filed the earlier claim, and thus the "rigid application of
9 res judicata would be undesirable." Id. Again, as was the case in
10 Lester, Gregory did not involve a firm holding that res judicata
11 would not be applied because of lack of representation.

12     Although the Court is not aware of any affirmative holdings
13 in this circuit applying res judicata where the claimant was
14 previously unrepresented, the applications in Lester and Gregory
15 are consistent with the overarching principles that the rules of
16 collateral estoppel and res judicata are tempered by fairness and
17 equity, and are qualified or rejected when their application
18 would contravene an overriding public policy or result in
19 manifest injustice. Thompson v. Schweiker, 665 F.2d 936, 940 (9th
20 Cir. 1982).

21     Here, although Plaintiff was not represented in the earlier
22 proceeding, Plaintiff elected to proceed in that action after
23 being advised of her right of representation. (A.R. 46.) There
24 was no apparent dearth of evidence to support the prior decision,
25 and there is no challenge to its accuracy here. The evidence of
26 Plaintiff's depression was such that the ALJ determined that
27 Plaintiff's depression was not a severe impairment; Plaintiff
28 herself reported that she became depressed after she was taken

1   off disability on October 2003. (A.R. 161, 33.) From the record
2   before this Court, it does not appear that Plaintiff's mental
3   condition was such that it affected her earlier claim or her
4   processing of it. The Court concludes that there are no
5   circumstances totally foreclosing some application of res
6   judicata, and, in view of the analysis undertaken by the ALJ in
7   the present proceeding, there are no facts suggesting that the
8   apparently limited application of res judicata undertaken by the
9   ALJ resulted in manifest injustice.

10      Plaintiff argues generally that the ALJ adjudicated the case
11  "under the misguided notion that Carter had to overcome the
12  presumption of non-disability." (Op. Br. p. 23.) The ALJ did
13  advert to his principle. However, review of the entire decision
14  reveals that the ALJ set forth generally accurate legal
15  standards, reviewed the evidence, and reached and articulated
16  findings based on application of those standards.

17      More specifically, as Defendant notes, although the ALJ here
18  initially adverted to the previous decision with respect to
19  Plaintiff's severe impairments, and he further noted res judicata
20  principles in his decision (A.R. 28-29), the ALJ fully analyzed
21  all the new evidence presented at each sequential step of the
22  disability analysis. (A.R. 28-36.) The ALJ considered the
23  pertinent evidence and determined whether Plaintiff's new
24  impairments (depression and diabetes) were severe. (A.R. 29.) He
25  determined that the impairments that were involved in the
26  previous proceeding (obesity and status post pin placement in the
27  hips) were severe because Plaintiff could not perform heavy
28  lifting because of them. (A.R. 29.) His specific reference to the

previous findings was limited and was in Plaintiff's favor: he simply found without review of the evidence that he was bound by the finding in the previous decision that Plaintiff could not perform her past relevant work as clerk typist. (A.R. 35.) This finding was not prejudicial to Plaintiff because it was in her favor. With respect to the remainder of the analysis, there was no reference to any preclusion of claims or issues with respect to any finding or with respect to the overall question of disability. The Court thus concludes that the actual application of res judicata by the ALJ was quite limited, and the analysis of the ALJ's reasoning by this Court thus will not be otherwise limited by principles of res judicata.

The Court concludes that there was no rigid, inappropriate application of res judicata. However, the ALJ's decision was erroneous because the ALJ wrongly failed to find, with respect to Plaintiff's credibility and the recent opinions of her treating doctors, that Plaintiff had demonstrated changed circumstances as to the extent of the limiting effects of Plaintiff's impairments and her RFC.  Therefore, the evidence at step five was insufficient to support the ALJ's decision.

VI. <u>Listed Impairment</u>

The ALJ expressly found that Plaintiff's impairments did not meet the severity of listing 1.02; the back injury had not resulted in nerve root compression to the extent required by listing 1.04A, arachnoiditis as required by listing 1.04B, or pseudoclaudication as required by listing 1.04C. (A.R. 30.)

Plaintiff argues that the ALJ should have considered Plaintiff's obesity in conjunction with listing 1.03, which

covers reconstructive surgery or surgical arthrodesis of a major weight-bearing joint with inability to ambulate effectively, as defined in 1.00B2b, and return to effective ambulation not occurring or expected to occur within twelve months of onset. (Brief p. 25.)

The Court notes that the ALJ considered both Plaintiff's obesity and her status post pin placement as severe impairments. Further, Plaintiff's doctors who opined as to Plaintiff's functional capacity clearly considered both Plaintiff's obesity and her hip condition. In the later portions of this opinion, the Court reviews and finds erroneous the ALJ's rejection of 1) Plaintiff's subjective complaints concerning her severe impairments, and 2) the opinions of Plaintiff's treating physicians as to Plaintiff's RFC as a result of her severe impairments.

Upon remand, Plaintiff's subjective complaints and her treating physicians' opinions as to the RFC resulting from Plaintiff's severe impairments must be taken as true by the ALJ. The Plaintiff may seek to have the ALJ reconsider the meeting or equivalence with the listings of Plaintiff's severe impairments, as reflected by Plaintiff's subjective complaints and the Plaintiff's treating physicians' opinions concerning Plaintiff's severe impairments.

VII. <u>Plaintiff's Subjective Complaints</u>

Plaintiff argues that the ALJ failed to state clear and convincing reasons, supported by substantial evidence, for rejecting Plaintiff's subjective complaints.

The ALJ noted Plaintiff's statements that she did limited

housework because of her pain, which caused difficulty with concentration; she could not sit for too long because of leg cramps. (A.R. 32.) Further, he noted Plaintiff's testimony that she weighed 315 pounds and could not work because sitting caused pain in her back, hips, and legs; the pins in her hip bones caused pain that was not ameliorated by surgery or injections; she had a numb right hand and took injections in her right elbow; and she had to lie down for about one or two hours a day, could stand and sit for thirty minutes each, and could do very little around the house. (A.R. 32-33.)

The court in Orn v. Astrue, 495 F.3d 625, 635 (9th Cir. 2007), summarized the pertinent standards for evaluating the sufficiency of an ALJ's reasoning in rejecting a claimant's subjective complaints:

> An ALJ is not "required to believe every allegation of disabling pain" or other non-exertional impairment. See Fair v. Bowen, 885 F.2d 597, 603 (9th Cir.1989). However, to discredit a claimant's testimony when a medical impairment has been established, the ALJ must provide "'specific, cogent reasons for the disbelief.' " Morgan, 169 F.3d at 599 (quoting Lester, 81 F.3d at 834). The ALJ must "cit[e] the reasons why the [claimant's] testimony is unpersuasive." Id. Where, as here, the ALJ did not find "affirmative evidence" that the claimant was a malingerer, those "reasons for rejecting the claimant's testimony must be clear and convincing." Id.
> Social Security Administration rulings specify the proper bases for rejection of a claimant's testimony. See S.S.R. 02-1p (Cum. Ed.2002), available at Policy Interpretation Ruling Titles II and XVI: Evaluation of Obesity, 67 Fed.Reg. 57,859-02 (Sept. 12, 2002); S.S.R. 96-7p (Cum. Ed.1996), available at 61 Fed.Reg. 34,483-01 (July 2, 1996). An ALJ's decision to reject a claimant's testimony cannot be supported by reasons that do not comport with the agency's rules. See 67 Fed.Reg. at 57860 ("Although Social Security Rulings do not have the same force and effect as the statute or regulations, they are binding on all components of the Social Security Administration, ... and are to be relied upon as precedents in adjudicating cases."); see

Daniels v. Apfel, 154 F.3d 1129, 1131 (10th Cir.1998)
(concluding that ALJ's decision at step three of the
disability determination was contrary to agency
regulations and rulings and therefore warranted
remand). Factors that an ALJ may consider in weighing a
claimant's credibility include reputation for
truthfulness, inconsistencies in testimony or between
testimony and conduct, daily activities, and
"unexplained, or inadequately explained, failure to
seek treatment or follow a prescribed course of
treatment." Fair, 885 F.2d at 603; see also Thomas, 278
F.3d at 958-59.

With respect to the course of analysis directed by the
regulations, the ALJ is first obligated to consider all symptoms
and the extent to which the symptoms can reasonably be accepted
as consistent with the objective medical evidence and other
evidence. 20 C.F.R. §§ 404.1529(a), 416.929(a). Once it is
determined that there is a medically determinable impairment that
could reasonably be expected to produce the claimant's symptoms,
the ALJ must then evaluate the intensity and persistence of the
symptoms to determine how the symptoms limit the capacity for
work. §§ 404.1529(b), (c); 416.929(b), (c). The ALJ will consider
all available evidence. To the extent that the claimant's
symptoms can be reasonably accepted as consistent with the
objective medical evidence and other evidence, the symptoms will
be determined to diminish the claimant's capacity for basic work
activities. §§ 404.1529(c)(4); 416.929(c)(4). A claimant's
statements will not be rejected solely because unsubstantiated by
the available objective medical evidence. §§ 404.1529(c)(2);
416.929(c)(2).

Further, the pertinent Social Security Ruling provides in
pertinent part that an ALJ has an obligation to articulate the
reasons supporting the analysis:

> When evaluating the credibility of an individual's statements, the adjudicator must consider the entire case record and give specific reasons for the weight given to the individual's statements.
>
> The finding on the credibility of the individual's statements cannot be based on an intangible or intuitive notion about an individual's credibility. The reasons for the credibility finding must be grounded in the evidence and articulated in the determination or decision. It is not sufficient to make a conclusory statement that "the individual's allegations have been considered" or that "the allegations are (or are not) credible." It is also not enough for the adjudicator simply to recite the factors that are described in the regulations for evaluating symptoms. The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight. This documentation is necessary in order to give the individual a full and fair review of his or her claim, and in order to ensure a well-reasoned determination or decision.

S.S.R. 96-7p at 4.

### A. Inconsistencies

Inconsistent statements are matters generally considered in evaluating credibility and are properly factored in evaluating the credibility of a claimant with respect to subjective complaints. In rejecting testimony regarding subjective symptoms, permissible grounds include a reputation for dishonesty, conflicts or inconsistencies between the claimant's testimony and his conduct or work record, or internal contradictions in the testimony; and testimony from physicians and third parties concerning the nature, severity, and effect of the symptoms of which the claimant complains. Moisa v. Barnhart, 367 F.3d 882, 885 (9th Cir. 2004); Thomas v. Barnhart, 278 F.3d 947, 958-59 (9th Cir. 2002). The ALJ may consider whether the Plaintiff's

1  testimony is believable or not. <u>Verduzco v. Apfel</u>, 188 F.3d 1087,

2  1090 (9th Cir. 1999).

3       Here, the ALJ concluded that the intensity, persistence,

4  and/or functionally limiting effects of Plaintiff's symptoms were

5  not substantiated by objective medical evidence, and thus he

6  would make findings concerning Plaintiff's credibility. (A.R.

7  32.)

8              1. <u>Urge to Eat</u>

9       The ALJ noted that Plaintiff had reported to mental health

10 that she had been depressed since she had been taken off total

11 disability in October 2003. (A.R. 33, 161.) Plaintiff had seen

12 Stanislaus County Behavioral Health and Recovery Services on

13 November 6, 2003, and she stated that after being taken off

14 disability she felt depressed because she felt as if people were

15 saying that she was lying about the pain she felt; further, when

16 she was depressed, she tended to want to eat too much, which was

17 a problem because of her obesity. (A.R. 161.) The ALJ reasoned

18 that Plaintiff's medical records showed that Plaintiff had gained

19 weight during the period between February 2002 and August 2003,

20 but she actually lost twenty pounds between August 2003 and

21 December 2003, near the time when her benefits were terminated in

22 October 2003. (A.R. 30.)

23      The record reflects that, as the ALJ stated, Plaintiff did

24 gain weight before the cessation of her benefits, and did lose

25 weight during the time around the cessation. (A.R. 50 [280 pounds

26 in February 2002, 285 in April 2002, and 294 in May 2002]; A.R.

27 237 [337 pounds in October 2002], 215 [342 pounds in June 2003],

28 214 [346 pounds in August 2003], 213 [344 pounds in October

1   2003], 212 [325 pounds in December 2003].) However, the ALJ's

2   reasoning is not logical. Overall, Plaintiff actually gained

3   weight. Further, Plaintiff's comment was regarding wanting to

4   eat, not eating. It was reasonable in the context of a

5   consultation for Plaintiff's depression that Plaintiff would

6   report an urge to eat, which was a desire that, in view of

7   Plaintiff's physical condition, raised risks to Plaintiff's

8   health. When Plaintiff was examined by her treating physician in

9   December 2003 at the time of her twenty-pound weight loss, the

10   notes reflect that Dr. Farley stated that Plaintiff was

11   encouraged to continue to reduce her eating that was secondary to

12   her pain and depression. (A.R. 212.) The fact that Plaintiff

13   could and did lose weight while participating in pool therapy

14   provides little reason to discredit Plaintiff's reporting of the

15   <u>urge</u> to eat, which Plaintiff and her treating physician continued

16   to address.

17       Plaintiff had stated in a disability report that she was

18   then also a sufferer of diabetes because of all the stress on her

19   body. (A.R. 143.) The ALJ reasoned that Plaintiff's diabetes was

20   related more to her weight and lack of exercise than to stress on

21   her body. (A.R. 33.) He relied on evidence that her orthopedist,

22   Dr. Pistel, had suggested gastric bypass surgery (A.R. 33, 340

23   [Dr. Pistel in March 2005 noted that Plaintiff continued to have

24   pain and would continue to work on her exercise program, and that

25   he advised her that she should talk with a Dr. Payne regarding

26   gastric bypass as a way to help]), and also on Dr. Farley's

27   recommendation that she keep a food and exercise diary (A.R. 33,

28   213 [In October 2003, when Plaintiff weighed 344 pounds, Dr.

1  Farley discussed with her a food and exercise diary for her
2  obesity]).

3       However, this reasoning is not clear and convincing in
4  force. "Stress" is a word of multiple meanings, and a reference
5  to stress on one's body could reasonably be interpreted to refer
6  to pressure or force on the body generated by obesity. "Stress"
7  in this context refers to any physical, chemical, or emotional
8  factor to which an individual fails to make a satisfactory
9  adjustment and which causes physiological tensions that may be a
10  contributory cause of disease. Webster's Third New International
11  Dictionary of the English Language Unabridged (2002) p. 2260.
12  Further, it refers to a constraining force, influence or
13  pressure, especially a force exerted when one part of the body
14  presses upon another. Id. Thus, Plaintiff's statement was not
15  significantly inconsistent with the clinical picture. Plaintiff's
16  remark was reasonably interpreted as a reference to the force of
17  Plaintiff's weight on her body, which was so serious that Dr.
18  Pistel recommended talking with Dr. Payne in March 2005 regarding
19  gastric bypass surgery "as a way to help." (A.R. 340.) Dr. Pistel
20  did not treat Plaintiff's diabetes, but rather addressed her
21  orthopedic problems. Plaintiff's reference to stress on her body
22  was not inconsistent with weight and lack of exercise as being
23  contributory causes of her diabetes. This reason does not provide
24  any clear and convincing basis for rejecting Plaintiff's
25  credibility.

26            2. Diagnoses
27       The ALJ also adverted to the inconsistency between
28  Plaintiff's statement to Dr. Pistel that EMG findings confirmed

spinal stenosis, and the medical record, which reflected that Dr. Dhaliwal in April 2005 stated that although EMG findings were normal, spinal stenosis was not ruled out, and further reflected that an MRI showed "only mild changes, with a small central bulge." (A.R. 34.) Dr. Dhaliwal's report of the electrodiagnostic report taken April 21, 2005, stated, "A normal study does not rule out underlying spinal stenosis. Clinical correlation is suggested." (A.R. 342.) Dr. Pistel's treatment note of April 26, 2005, stated, "She had a recent EMG which she was told revealed spinal stenosis. She has a clinical picture that is consistent." (A.R. 339.) Dr. Pistel's plan of the same date included getting an MRI to complement the EMG. (Id.)

The allegedly inconsistent remark that the ALJ attributed to Plaintiff was a doctor's statement about a statement that the Plaintiff made about a diagnostic type of statement that yet another professional made. Dr. Dhaliwal's note about what the test showed or did not rule out is the type of statement that can easily be misunderstood by a lay person, who is not reasonably held to understand the subtle differences between a test result's affirmatively showing something and its not ruling something out. Further, the ALJ was relying on multiple layers of hearsay. In view of Plaintiff's multiple structural problems, the fact that only a bulge affecting the thecal sac (as distinct from some more severe form of impingement involving significant nerve root compression) was ultimately found does not increase the probative force of the inference. The Court concludes that considering the context, the inconsistency is slight and is not of clear and convincing force.

### 3. <u>Injections</u>

The ALJ also relied on an inconsistency concerning the success of Plaintiff's injections, stating in pertinent part:

> In January 2006, Dr. Pistel scheduled additional
> injections for pain, as the claimant had had a
> positive response. It would have been unlikely that the
> claimant scheduled additional injections if the
> first injections provided no relief as the claimant
> alleges.

(A.R. 34.)

The record does not support the ALJ's conclusion; instead, it shows that Plaintiff repeatedly stated that the injections were not helpful, and it also reveals that the injections had a diagnostic purpose in addition to a merely therapeutic purpose. In September 2003, Plaintiff reported to Dr. Pistel that an epidural injection given by Dr. Heron had provided only short, minimal relief; Dr. Pistel recommended a second opinion concerning hip replacement and/or treatment. (A.R. 313, 316.) On October 9, 2003, Plaintiff saw Dr. Rajagopalan regarding her hip degeneration, and he recommended injecting the hip with DepoMedrol and Marcaine under CM guidance for both therapeutic and diagnostic purposes. (A.R. 312, 315.) Dr. Pistel and Dr. Rajagopalan agreed on the treatment plan. (A.R. 310.) On December 26, 2003, Plaintiff reported to Dr. Farley that she had been seen Dr. Dobson, and injections brought no relief; then Dr. Pistel had given her left hip an injection under fluroscopy on December 18, 2003, and it had not caused any improvement in her back or hip pain. (A.R. 212.)

On January 5, 2004, Plaintiff reported to Dr. Pistel that she did not get much relief from the injection; Dr. Pistel

advised Plaintiff that it was too soon to consider another
injection, and that she should continue conservative management
to avoid total hip arthroplasty as long as possible. (A.R. 309.)
In July 2005, Dr. Pistel advised a diagnostic and therapeutic
injection into the hip joints and the greater trochanteric region
under fluoroscopy to delineate the pain. (A.R. 325.) On September
27, 2005, Dr. Bairamian at the neurosurgery clinic reported that
Plaintiff stated that a hip injection did not offer her help.
(A.R. 328.) Dr. Bairamian referred her for an epidural block in
addition to physical therapy. (A.R. 328-29.) In December 2005,
Dr. Pistel stated that he felt that before considering hip
replacement surgery, a second trial injection should be given; he
would schedule one in the next few weeks. (A.R. 325.) In January
2006, Plaintiff received injections in her bilateral hip joints.
(A.R. 358-59.) Dr. Pistel reported that Plaintiff had had a
positive response to injection of the hips and was there for a
repeat injection under fluoroscopy. (A.R. 356.) Plaintiff
testified that Cortisone and Methadone shots that she had
received three times were not helping her, so she was being sent
to UC Medical in San Francisco. (A.R. 437.)

   Although Dr. Pistel stated that Plaintiff had had a positive
response to the injection, the nature of that response was not
detailed; it is not clear whether the response in question was a
therapeutic response or some progress in diagnosis. However, in
any event, Plaintiff's medical history reflects that she
repeatedly and consistently reported that the injections were not
significantly helpful with respect to her subjective symptoms,
and that despite her reports that the injections had not helped

her pain, her doctors continued to recommend injections. Indeed, on one occasion, when Plaintiff reported no subjective gain from the injection, Dr. Pistel stated it was nevertheless too soon to consider another; thus, it affirmatively appears in the record that Dr. Pistel considered recommending injections despite Plaintiff's reports of her reactions.

Thus, under the circumstances of the case, the slight inconsistency alluded to by the ALJ does not constitute a clear and convincing reason for concluding that Plaintiff was not credible.

### 4. Inconsistent Medical Records

The ALJ also relied on medical records that reflected clinical signs that were inconsistent with the more customary picture of Plaintiff's functionality.

In concluding that Plaintiff's limited activities were not related to a restricted range of motion, the ALJ noted Dr. Bairamian's failure to recommend surgery because of Plaintiff's normal motor strength, normal sensation, and negative straight leg raise. (A.R. 34.) Dr. Bairamian, a neurosurgeon, evaluated Plaintiff in September 2005 and commented on potential surgical intervention only with respect to the spine, and not with respect to the hips or lower extremities. (A.R. 328-29.) Further, he himself noted tenderness in the lower lumbar region, uncomfortable hip rotation on the left, and some degenerative changes at L5-S1. He recommended a course of physical therapy, an epidural block, and losing weight. (A.R. 329.) When viewed in its entirety, Dr. Bairamian's clinical findings and recommendations, which included uncomfortable hip rotation on the left, cannot be

said to constitute substantial evidence supporting a finding of unrestricted range of motion. Further, they are inconsistent with the weight of the medical evidence.

In concluding that Plaintiff did not have a restricted range of motion that limited her activities, the ALJ also relied on an observation regarding Plaintiff's full range of motion in the hips made in December 2005 at Doctors Medical Center Emergency Department. (A.R. 34, 365-66.) The probative force of this observation is undercut by the concurrent recommendation that Plaintiff be treated with further cortisone injections, by concurrent treatment with Demerol 100 and Phenergan 50 IM, and with no recommendation for change of Plaintiff's pain medications, which at that point included, among others, Methadone and Hydrocodone. (A.R. 365.) The reasoning was not clear and convincing.

      B. <u>Failure to Obtain Treatment or Follow Treatment Recommendations</u>

          1. <u>Diabetes</u>

In his conclusion that Plaintiff's diabetes appeared to be related more to her weight and lack of exercise than to her assertion that it was because of stress on her body, the ALJ noted that Plaintiff's treatment records showed that she was treated in the hospital for diabetes when she did not take medication. (A.R. 33.) He noted two hospitalizations when she had not taken Glucophage, stating that the second time, in July 2004, she had stopped taking her medication for two weeks. (A.R. 29.)

Plaintiff's records reflect that she was diagnosed (new diagnosis) of diabetes mellitus type 2 and prescribed Glucophage

1  on April 28, 2004. (A.R. 207.) She was referred from urgent care
2  to the emergency department of Doctor's Medical Center on May 25,
3  2004, less than a month after the new diagnosis, and discharged
4  on May 26, 2004. (A.R. 239-40.) She was admitted with high blood
5  sugar because she had run out of her Glucophage five days before
6  and had just started taking it again that day. She was discharged
7  with instructions to lose weight, go on a diabetic diet, and take
8  needed medication. (A.R. 248, 254.) Plaintiff was again treated
9  for high blood sugar on July 9, 2004, when it was noted that she
10 had held her Glucophage for days with reference (illegible) to a
11 surgery, so she took some but had a high sugar, got an insulin
12 shot, and then went home; she was advised to return. (A.R. 282-
13 89.) She was admitted on July 10, 2004, for hyperglycemia;
14 although her Glucophage dose had been increased after she had
15 been feeling bad in June and had very high glucose, she stopped
16 the medication a week before July 10 for a surgery, which was
17 canceled on July 9 because of high glucose. (A.R. 262.) It was
18 noted that Plaintiff had very poorly controlled diabetes with
19 little insight into the disease; the plan was to initiate insulin
20 and diabetic education. (A.R. 263-65.)

21      An ALJ's decision to reject a claimant's testimony cannot be
22 supported by reasons that do not comport with the agency's rules
23 and regulations, including Social Security Rulings, which,
24 although not of the same force and effect as a statute or
25 regulation, are nevertheless binding on all components of the SSA
26 and are to be relief upon as precedents in adjudicating cases.
27 Orn v. Astrue, 495 F.3d 625, 636 (9th Cir. 2007).

28      In Byrnes v. Shalala, 60 F.3d 639, 641 (9th Cir. 1995), in

the course of reviewing the required procedure for an ALJ's considering whether noncompliance affects the validity of subjective complaints, the court stated in pertinent part:

> However, before basing a denial of benefits on noncompliance, the ALJ must "examine the medical conditions and personal factors that bear on whether [a claimant] can reasonably remedy" his impairment and must make specific findings. Dodrill v. Shalala, 12 F.3d 915, 919 (9th Cir.1993); accord Preston v. Heckler, 769 F.2d 988, 990 (4th Cir.1985) (The ALJ "must develop a record establishing by substantial evidence that the claimant's impairment is reasonably remediable by the particular individual involved, given ... her social or psychological situation, and that [she] lacks good cause for failing to follow a prescribed treatment program."). Also "[e]ssential to a denial of benefits pursuant to Section 404.1530 is a finding that if the claimant followed her prescribed treatment she could return to work." Rousey v. Heckler, 771 F.2d 1065, 1069 (7th Cir.1985).

In Byrnes, the court applied the principles to hypoglycemic reactions, which were subjective phenomena not subject to objective measurement. The claimant had argued that the ALJ had failed to make sufficient underlying findings to reject the claimant's subjective complaints. The Court agreed:

> Because the ALJ made no finding that "[Byrnes] was not complying with [his] prescribed treatment program[,] that [he] lacked good cause for failing so to comply," or that if he stopped smoking he could return to work, we "decline to review the record to ascertain whether substantial evidence might support these findings not made." Rousey, 771 F.2d at 1069; Preston, 769 F.2d at 990; see generally Cequerra v. Secretary of Health and Human Services, 933 F.2d 735, 738 (9th Cir.1991) ("A reviewing court can evaluate an agency's decision only on the grounds articulated by the agency.").

Byrnes v. Shalala, 60 F.3d 639, 641 (9th Cir. 1995). The court in Byrnes thus specifically held that before denying benefits based on noncompliance, the ALJ must examine the medical conditions and personal factors that bear on whether a claimant can reasonably

1  remedy his impairment, and the ALJ must make specific findings.

2  Byrnes v. Shalala, 60 F.3d 639, 641 (9th Cir. 1995). It is only

3  unexplained or inadequately explained failures to seek treatment

4  or to follow a prescribed course of treatment that will suffice

5  as a basis for a negative credibility finding. Orn v. Astrue, 495

6  F.3d 625, 636, 638.

7      Here, the ALJ's decision lacks any indication that the ALJ

8  considered whether or not Plaintiff had good cause for failing to

9  comply with treatment for her diabetes. There was no exploration

10 of the extent of any education given to Plaintiff with the new

11 diagnosis, the degree of the Plaintiff's understanding of her

12 impairment or her medical instructions, or any other pertinent

13 circumstances. However, on at least one of the two occasions,

14 Plaintiff stopped her medication because of an anticipated

15 surgery. The record does not reflect what the circumstances

16 surrounding the surgery were or whether or not Plaintiff had good

17 cause to proceed in that manner. Further, the record amply

18 reflects that Plaintiff had poor insight into her recently

19 diagnosed condition of diabetes. Finally, the Court notes that in

20 the treatment note of April 28, 2004, the date on which

21 Plaintiff's diabetes was first diagnosed and her medication first

22 prescribed, it was stated that Plaintiff did not have the money

23 to obtain four of her other six medications. (A.R. 207.) The

24 record strongly suggests that Plaintiff had not been adequately

25 instructed as to the necessity and importance of consistent

26 treatment and the underlying physical condition; it also reflects

27 that Plaintiff had limited financial resources with which to

28 purchase medication. Under the circumstances, the ALJ's findings

38

and analysis do not comport with the requirements set forth in
Byrnes v. Shalala, 60 F.3d 639. The Court concludes that the
ALJ's reasoning concerning Plaintiff's failure to take her
medication for diabetes was not clear and convincing.

The ALJ noted that Plaintiff also sought treatment at
Doctor's Medical Center on December 22, 2005, when she reported
that her blood sugar level had been 121. (A.R. 29.) The record
reveals that Plaintiff presented with bilateral hip pain, and her
finger-stick blood sugar that morning had been 121. (A.R. 365.)
The significance of this is not clear, but the mere fact of low
blood sugar does not reliably demonstrate that Plaintiff had
failed to comply with directions regarding treatment. It does not
rise to a clear and convincing reason for an adverse credibility
finding.

### 2. Failure to Exercise and Lose Weight

The ALJ noted that Plaintiff's physicians had repeatedly
told her that her condition was related to her size and lack of
activity, but Plaintiff had not generally followed the advice or
followed through on the recommended activity. (A.R. 33-34.) He
also stated that in December 2003, Plaintiff stated that she had
tried to do the exercises that the therapist had prescribed, but
she made no mention of any other forms of exercise that were
recommended, such as swimming, walking, and working out in a gym.
(A.R. 34.) It clearly appears that the ALJ relied on Plaintiff's
failure to follow recommendations to exercise and to lose weight.

As previously noted, a failure to follow prescribed
treatment may be used to support a negative credibility finding
where there are no good reasons for the failure; however, an ALJ

39

must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the person may provide, or other information in the case record that may be explanatory. Soc. Sec. Ruling 96-7p at 7.

As the preceding review of Plaintiff's medical history reflects, Plaintiff, who was diagnosed as morbidly obese, was often encouraged to exercise and to lose weight. However, it is recognized that the goals for treatment of obesity are generally modest, and treatment is often ineffective. Orn v. Astrue, 495 F.3d 625, 637-38 (9th Cir. 2007). Thus, in this circuit it is recognized that the failure to follow treatment for obesity "tells us little or nothing about a claimant's credibility." Orn, 495 F.3d at 638. Such is the case here, where there was no clear evidence cited that the treatment was likely to be successful, and where there is no indication in the decision that the ALJ even considered whether Plaintiff, who on the basis of past experience was concerned about exacerbating her condition, had a good reason for not following the treatment regimen. The Court concludes that the ALJ's reasoning in this regard is not clear and convincing.

Likewise, to a great extent, the ALJ's reasoning concerning Plaintiff's failure to exercise is part and parcel of obesity treatment and thus presents the same deficiencies.

To the extent that the failure to exercise can be separated from a failure to lose weight, the Court notes that the record supports a finding that Plaintiff participated in water therapy several times a week for an extended period. (A.R. 349, 207, 217,

318, 345.) Further, Plaintiff repeatedly expressed concerns about perceived negative effects of therapy or exercise, which included her experience of increased pain (A.R. 210 [February 2003], 319 [March 2003], 317 [July 2003], 311 [Dr. Pistel's opinion that the only effective treatment for her continued pain was anesthesia], 344 [March 2005 post-surgery therapy and increased activity level causing increased pain], 337 [May 2005 home exercise program not helping, pain worse, MRI planned], as well as her desire to confer with a doctor for advice as to what to do with respect to therapy (A.R. 336 [August 2005]) and fear about restarting therapy because of prior episodes with pins extruding after physical therapy (A.R. 327 [October 2005]). There is no indication in the ALJ's decision that he explored Plaintiff's understanding of the therapy required, the expectations of her doctors at any given point in the therapy regimen, or the legitimacy of her reasons for her limited participation in therapy.

Given the incomplete reasoning of the ALJ in connection with this credibility finding, the Court concludes that the ALJ's reasoning was not clear and convincing.

### 3. Misuse of Medications

The ALJ also noted that Dr. Pistel planned to wean Plaintiff from pain medication and muscle relaxers, and the pain clinic sought to reduce her Elavil; Plaintiff had stated in December 2003 that she used the medications prescribed at night time during the day, and thus the ALJ concluded that she was using the medications in a manner other than prescribed. (A.R. 34.)

In a daily activities questionnaire completed on December

22, 2003, Plaintiff stated that she could not sleep at all because of twisting and turning all night long; she would arise at 7:00 a.m. to see her oldest daughter off to school, and then lie back down because of pain and tiredness; she stated that she took more of her night-time medication during the day to help her get around a little. She also stated that the medications she took to sleep were Soma, Lortab, Elavil, and Vioxx. (A.R. 134.) It appears that one of the medications taken for sleeping was actually a muscle relaxer (Soma) (A.R. 213), and others had been prescribed for pain in the back and hips (Vioxx, Lortab, Elavil) (A.R. 212-13, 134). Because of the generality of Plaintiff's statement, the multiplicity of medications taken by Plaintiff, and the lack of a specific record documenting instructions contrary to Plaintiff's behavior, it is not clear to what extent Plaintiff was actually taking medications in a manner or for a purpose other than what had been prescribed. Accordingly, the ALJ's reasoning in this regard was not clear and convincing.

## C. Desire to Raise Her Children Well

Finally, the ALJ noted that Plaintiff had stated to mental health professionals in November 2003 that she wanted to get back on disability and be able to raise her children as well as possible (Plaintiff had three children, the youngest two and three years old). The ALJ stated:

> Apparently, the claimant considered that she was not too disabled to raise her children, but she needed the disability money to raise her children on. There is no indication that the (sic) any agency has considered the claimant to need assistance in caring for her children.

(A.R. 33.)

The record reflects that Plaintiff's remark was made in

42

1   November 2003 to intake staff at Stanislaus County Behavioral

2   Health and Recovery Services; her statement was noted under the

3   "STRENGTH ASSESSMENT" portion of the intake form on a blank next

4   to the words "Vision/hopes/goals." (A.R. 160-64, 162.) Other

5   parts of the form document Plaintiff's statements that she would

6   have liked to work but could not, and she spent time teaching her

7   children.

8       Desiring to obtain disability benefits and wanting to raise

9   one's children are not necessarily inconsistent; although one who

10  is disabled is unable to engage in full-time employment, such a

11  person does not necessarily surrender totally one's usefulness to

12  one's children or one's dreams of being as good a parent as

13  possible despite physical limitations. To the extent that

14  Plaintiff's remark was significant to the ALJ because Plaintiff

15  had not asked for assistance in caring for her children, and it

16  thus reflected some inconsistency in her ability to "raise" her

17  children, any probative force of such an inference was not clear

18  and convincing. "Raising" one's children is a broad and amorphous

19  term that might include or exclude numerous parenting activities

20  in which normal parents might engage. To the extent that

21  Plaintiff's remark might have referred to strictly physical

22  activities of parenting, questionnaires concerning Plaintiff's

23  functioning and activities reflected that she and her fiancé of

24  many years lived together[5]; he did much of the shopping and

25  cooking, cleaning, and looking after the children; Plaintiff fed

26

27          [5] The record reflects Plaintiff's testimony that by the time of the hearing, Plaintiff and her fiancé were

28  married (A.R. 432), and Plaintiff tried to do the best she could with her children, who came and lay on her bed with
    her and did homework with her (A.R. 443).

1  them breakfast and dinner sometimes, and might wash dishes or use

2  the dish washer, but she was significantly aided in her household

3  and parenting tasks by her fiancé. (A.R. 125-39.)

4      Further, a desire to receive disability benefits is clearly

5  not inconsistent with disability or reflective of a wrongful

6  state of mind. People who believe themselves to be disabled and

7  in need of financial assistance rightly desire to receive

8  disability benefits.

9      Accordingly, the Court concludes that Plaintiff's abiding

10 desire to raise her children as well as possible was not

11 inconsistent with her subjective complaints.

12     VIII. <u>Rejection of Opinion of Treating Physicians</u>

13         A. <u>Dr. Pistel</u>

14     Plaintiff argues that the ALJ failed to state specific and

15 legitimate reasons for rejecting the opinions of Dr. Pistel, who

16 had treated Plaintiff beginning in March 2003. (A.R. 34.) Dr.

17 Pistel in November 2003 opined that Plaintiff's x-rays and

18 examination revealed significant arthritic change in the

19 coccymagna as a result of the slipped capital epiphysis;

20 Plaintiff suffered continued pain in both legs and the low back

21 and had gained a significant amount of weight. Due to her medical

22 condition, any type of work or activity would be impossible.

23 (A.R. 311.) On February 28, 2006, he concluded that because of

24 multiple skeletal problems, continued pain in both legs and low

25 back, and significant arthritic change in the coccymagna,

26 Plaintiff could sit for a total of one hour in an eight-hour

27 workday, stand/walk twenty for thirty minutes, was unable to

28 engage in any type of activity or work and thus could not even

                                    44

perform sedentary work, and was disabled. (A.R. 390.)

The ALJ stated:

The claimant first told Dr. Farley of her limitations.
No treatment records show that a doctor assessed
limitations. Although Dr. Pistel stated that current
x-rays showed significant arthritic changes, the x-rays
(sic) reports are not contained in the treatment records.
Hip x-rays from Doctors Medical Center showed minimal
osteoarthritic changes. In the treatment records, Dr. Pistel
stated that the claimant should be weaned from pain
medication and muscle relaxers. Dr. Pistel and the Pain
Clinic often urged the claimant to increase her
activity level, not decrease her activity level. I give
little weight to Dr. Pistel's assessment, as it is not
consistent with the recommendations he and other treating
physicians made in the treatment records. I also note
that his conclusions are administrative, not medical, and
are on issues reserved to the Commissioner.

(A.R. 35.)

The standards for evaluating the opinions of treating

sources opinions are as follows:

By rule, the Social Security Administration favors
the opinion of a treating physician over
non-treating physicians. See 20 C.F.R. § 404.1527.
If a treating physician's opinion is
"well-supported by medically acceptable clinical
and laboratory diagnostic techniques and is not
inconsistent with the other substantial evidence
in [the] case record, [it will be given]
controlling weight." Id. § 404.1527(d)(2). If a
treating physician's opinion is not given
"controlling weight" because it is not
"well-supported" or because it is inconsistent
with other substantial evidence in the record, the
Administration considers specified factors in
determining the weight it will be given. Those
factors include the "[l]ength of the treatment
relationship and the frequency of examination" by
the treating physician; and the "nature and extent
of the treatment relationship" between the patient
and the treating physician. Id. §
404.1527(d)(2)(i)-(ii). Generally, the opinions of
examining physicians are afforded more weight than
those of non-examining physicians, and the
opinions of examining non-treating physicians are
afforded less weight than those of treating
physicians. Id. § 404.1527(d)(1)-(2). Additional
factors relevant to evaluating any medical
opinion, not limited to the opinion of the

treating physician, include the amount of relevant
evidence that supports the opinion and the quality
of the explanation provided; the consistency of
the medical opinion with the record as a whole;
the specialty of the physician providing the
opinion; and "[o]ther factors" such as the degree
of understanding a physician has of the
Administration's "disability programs and their
evidentiary requirements" and the degree of his or
her familiarity with other information in the case
record. Id. § 404.1527(d)(3)-(6).

Orn v. Astrue, 495 F.3d 625, 631 (9th Cir. 2007).

With respect to proceedings under Title XVI, the Court notes
that an identical regulation has been promulgated. See, 20 C.F.R.
§ 416.927.

As to the legal sufficiency of the ALJ's reasoning, the
governing principles have been recently restated:

The opinions of treating doctors should be given more
weight than the opinions of doctors who do not treat
the claimant. Lester [v. Chater, 81 F.3d 821, 830 (9th
Cir.1995) (as amended).] Where the treating doctor's
opinion is not contradicted by another doctor, it may
be rejected only for "clear and convincing" reasons
supported by substantial evidence in the record. Id.
(internal quotation marks omitted). Even if the
treating doctor's opinion is contradicted by another
doctor, the ALJ may not reject this opinion without
providing "specific and legitimate reasons" supported
by substantial evidence in the record. Id. at 830,
quoting Murray v. Heckler, 722 F.2d 499, 502 (9th
Cir.1983). This can be done by setting out a detailed
and thorough summary of the facts and conflicting
clinical evidence, stating his interpretation thereof,
and making findings. Magallanes [v. Bowen, 881 F.2d
747, 751 (9th Cir.1989).] The ALJ must do more than
offer his conclusions. He must set forth his own
interpretations and explain why they, rather than the
doctors', are correct. Embrey v. Bowen, 849 F.2d 418,
421-22 (9th Cir.1988).
Reddick v. Chater, 157 F.3d 715, 725 (9th Cir.1998);
accord Thomas, 278 F.3d at 957; Lester, 81 F.3d at
830-31.

Orn v. Astrue, 495 F.3d 625, 632 (9th Cir. 2007).

The ALJ did not advert to any opinion that directly
supported the RFC he found for Plaintiff. The RFC he assigned to

46

Plaintiff was light work (lifting and carrying up to twenty pounds occasionally and ten pounds frequently), with an ability to stand and walk ("stand/walk") up to six hours in an eight-hour work day, but with avoidance of heights and dangerous moving machinery, and with no climbing of ladders, ropes, or scaffolds or operating foot controls. (A.R. 35, 37.) This differed from the RFC found in the earlier proceeding (light work with only occasional bending, stooping, and twisting, but no squatting, kneeling, crawling, or climbing, and no work around hazards, such as machinery and heights). Further, the ALJ undertook to evaluate fully the new evidence of the opinions of her treating physicians. It thus cannot fairly be inferred that he considered the findings in the previous proceeding to have been res judicata.

The ALJ gave little weight to the opinions of Plaintiff's treating physicians; thus, he did not rely on them. The RFC assigned by the ALJ also differs from the opinion of state agency physicians Patrick Bianchi, M.D., and A. Dipsia, M.D., who completed physical RFC assessments on or about March 17, 2004, and August 17, 2004, to the effect that Plaintiff could perform light work, could stand at least two hours in an eight-hour workday (but apparently could not stand about six hours), sit about six hours in an eight-hour work day, but with limited pushing and pulling in the upper extremities, no climbing ladders, ropes, or scaffolds, no kneeling or crawling, and only occasional climbing of ramps and stairs, balancing, stooping, and crouching. (A.R. 196-203.) This is the evidence relied upon by Defendant as the support for the ALJ's decision. It apparently is

1 also the only opinion evidence concerning Plaintiff's RFC that

2 contradicts the opinions of the treating physicians that

3 Plaintiff was disabled. However, the ALJ neither adverts to the

4 opinions, explains his assessment of those opinions, or explains

5 why he finds capacities greater than those assessed by the state

6 agency physicians.

7 　　It is established that an ALJ's opinion must contain

8 sufficient findings to permit intelligent judicial review; an ALJ

9 need not discuss all evidence in the record, but the ALJ may not

10 reject significant probative evidence without explaining why it

11 was rejected. <u>Vincent v. Heckler</u>, 739 F.2d 1393, 1394-95 (9th Cir.

12 1984). The ALJ failed to perform his obligation in this regard.

13 　　The ALJ failed to state specific and legitimate reasons for

14 rejecting the opinion of Dr. Pistel, Plaintiff's treating

15 orthopedist, who treated Plaintiff for several years before the

16 ALJ rendered his opinion.

17 　　The ALJ noted that it was Plaintiff who had first told Dr.

18 Farley of her limitations; he reasoned that no treatment records

19 showed that a doctor had assessed any limitations. (A.R. 35.)

20 This does not appear to be a mere reference to the subjective

21 nature of Plaintiff's experience of pain; rather, it is more

22 reasonably understood as a reference to the absence of any

23 assessment of limitations in the treatment records. However, this

24 reason lacks legitimate force in the context of this case.

25 Plaintiff already led a life of extremely limited movement. When

26 Dr. Pistel first saw her in March 2003, Plaintiff demonstrated

27 limited spinal motion, side bending, and rotation as well as very

28 limited range of motion in the hip, and a sciatic condition that

1 precluded examination of the sciatic nerve. (A.R. 319.) She
2 continued to manifest pain and marked limitations upon movement
3 during examination and to report constant or severe pain that
4 worsened with prolonged sitting, and with walking and standing.
5 (A.R. 219, 307, 349.) It was made clear to her physical therapist
6 and her pain management doctors that she already was not working
7 and had been disabled and off work for fifteen years because of
8 her pain. (A.R. 225, 327, 333, 344-45.)

9 It was Plaintiff's abnormal hips and spine and her obesity,
10 objectively manifested conditions, that caused Plaintiff's
11 inability to move without pain. The efforts of her treating
12 physicians were to increase her exercise and motion and to
13 decrease her weight, not to determine what her limitations were.
14 Given her circumstances, it was not logical to expect that her
15 physicians would assess precise limitations on her movement.

16 The ALJ also stated that although Dr. Pistel stated that
17 current x-rays showed significant arthritic changes, the x-ray
18 reports were not contained in the treatment records; hip x-rays
19 from Doctors Medical Center showed minimal osteoarthritic
20 changes. (A.R. 35.) This is a reference to Dr. Pistel's opinion
21 of November 7, 2003, in which he referred to Plaintiff's having
22 gained weight and her multiple musculoskeletal problems
23 concerning her legs, hips, and low back, including capital
24 femoral epiphysis. (A.R. 311.) The doctor stated that her current
25 x-rays and examination revealed significant arthritic change
26 coccymagna as a result of her slipped capital epiphysis. A search
27 of the record reveals no x-ray images or reports during this
28 time. However, the only logical inference is that such x-rays

49

existed because before Dr. Pistel's report, other treatment
providers did refer to x-rays. (A.R. 225 [physical therapy report
of January 2003 refers to an x-ray that reflected increased L-
spine lordosis]; 315 [Dr. Rajagopalan's review of October 2003
stated that Plaintiff had been having "mild degenerative
changes"].) The presence of x-rays showing changes is consistent
with later x-rays that revealed mild arthritic changes at L5-S1
in the spine (A.R. 328-29 [September 27, 2005]), multiple pins
fixing bilateral femoral neck fractures, and a bent pin in the
left hip with some minimal osteoarthritic change involving the
hips (A.R. 365-67 [December 2005]). Further, it is consistent
with the MRI taken in August 2005, which revealed a small central
bulge at L5-S1 with mild compression of the thecal sac without
evidence of nerve root compression, and with associated mild
facet joint arthropathy. (A.R. 333, 387.)

     The record does not support the ALJ's apparent assumption
that x-rays supportive of the treating doctors' opinions were
lacking. Further, given Plaintiff's multiple musculoskeletal
conditions that were consistently documented with objective
medical records and accompanied by documented clinical signs, the
ALJ's conclusion about the extent of Plaintiff's limitations was
not supported by substantial evidence. The fact that hip x-rays
would show minimal osteoarthritic changes does not necessarily
mean that such changes had minimal or insignificant effect in the
case of Plaintiff, who was obese, suffered degenerative spinal
process, was status post pin placement, and was expected
eventually to require total hip replacement. As her treating
physician, Dr. Pistel, explained, her low back problem was

50

1  potentially caused by her hip condition and hip surgery's effect

2  on her joint mechanics, as well as abdominal girth that was

3  actually causing the spine to go into lordosis and pain pattern.

4  (A.R. 319.) Shortly before he rendered his first RFC opinion, Dr.

5  Pistel stated that Plaintiff's body habitues and size would

6  continue to contribute to chronic low back and hip pain, although

7  her degenerative hip problem would continue to bother her. (A.R.

8  316.) Again, Dr. Rajagopalan explained in October 2003, shortly

9  before Dr. Pistel rendered his opinion, the following:

> She has been having mild degenerative changes. This is
> subsequent to her size and inflammation from her load of
> her hip. The hips are a very concentric joint and
> therefore a little bit of changes with increased load
> on it will cause significant symptoms.

13 (A.R. 315.)

14      The ALJ also stated that because Dr. Pistel had recommended

15 that Plaintiff should be weaned from pain medication and muscle

16 relaxers, and the pain clinic had often urged Plaintiff to

17 increase her activity level, not decrease her activity level, he

18 thus gave little weight to Dr. Pistel's opinion. (A.R. 35.)

19      It is established that inconsistencies between supporting

20 findings or treatment history, on the one hand, and the expert's

21 opinion on the other, can constitute a basis for placing less

22 weight on a physician's opinion. Bayliss v. Barnhart, 427 F.3d

23 1211, 1216 (9th Cir. 2005). However, in the context of Plaintiff's

24 case, there is little inconsistency that warrants rejecting the

25 opinion of Plaintiff's long-term treating physician. Because

26 Plaintiff was so extremely sedentary and had been so for such an

27 extended period of time, and because her problems stemmed not

28 from just the abnormality of her hips, but also her obesity, her

degenerative spinal arthritis, and the combined stress or force
that all these conditions put on her body, there would
necessarily be a long span of effort and experience between
becoming stronger and more active, on the one end of the
continuum, and being able to perform full-time employment at the
other end. Plaintiff's physicians and therapists encouraged her
to walk and stretch and to perform limited movement under water,
and to lose weight and to strengthen and condition herself so
that she could become active; there is no evidence that they
encouraged or even envisioned immediate full-time employment. The
fact that Plaintiff's physicians anticipated that Plaintiff could
successfully become more active did not logically support a
conclusion that she was therefore capable of basic work
activities on a day-to-day basis, and that no considerable weight
should be given to the opinion of her treating physician, who had
consistently treated her for years, who rendered the only
treater's opinion regarding her RFC that the ALJ did not simply
dismiss out of hand, and whose comprehensive diagnoses of obesity
and/or morbid obesity, lordosis exacerbated by obesity, status
post pin placement, and degenerative spinal process in the lumbar
spine were consistently supported by objective clinical indicia
and were not contradicted or significantly undercut by any other
treating or examining physician's findings or conclusions.

Likewise, that Plaintiff was to be weaned from her pain
medication did not mean that her pain was not real or
significant; rather, her doctors were attempting to encourage
weight loss and shift the emphasis of treatment to encourage
lifestyle changes that would benefit Plaintiff in the long term.

1    Defendant's argument that it is for the ALJ to resolve

2 evidentiary conflicts is valid in principle, but in application,

3 it misses the mark. To the extent that medical evidence is

4 inconsistent or conflicting, it is the responsibility of the ALJ

5 to resolve any conflicts. Morgan v. Commissioner, 169 F.3d 595,

6 603 (9th Cir. 1999); Saelee v. Chater, 94 F.3d 520, 522 (9th Cir.

7 1996); Matney on Behalf of Matney v. Sullivan, 981 F.2d 1016,

8 1020 (9th Cir. 1992). However, this does not immunize the ALJ's

9 reasoning from this Court's substantial evidence review, and it

10 does not permit the rote adoption of a non-examining doctor's

11 opinion in the face of a record that abounds with evidence

12 consistent with the treating doctor's opinion and lacks

13 substantial evidence supporting the ALJ's conclusion.

14    Further, it is not clear that to the extent that they would

15 be consistent with the ALJ's determination of Plaintiff's RFC,

16 the opinions of Drs. Bianchi and Dipsia are substantial evidence.

17 They do technically rest on findings other than those made by Dr.

18 Pistel. This is because Dr. Farley's findings preceded and

19 amplified Dr. Pistel's involvement. (A.R. 157-59, 179-81.)

20 However, Dr. Farley's findings are not inconsistent with those of

21 Dr. Pistel for that period of time. (A.R. 236 [October 2002,

22 tenderness to palpation over the paraspinal muscles and ST joint,

23 straight leg test to forty-five degrees without pain in hip and

24 buttock, pain to interior and exerior rotation of the lower

25 extremities, some grinding in the left hip]; A.R. 234 [December

26 2002, pain constant and unimproved, exacerbated by lying down or

27 sitting; tenderness to palpation over the paraspinal muscles

28 bilaterally and over the buttocks, pain in the paraspinal muscles

1 with straight leg raising, no radicular symptoms, flexion at
2 forty-five degrees secondary to weight, tight hamstrings,
3 sciatica]; A.R. 213 [October 2003, reports of inability to sit
4 more than thirty minutes or walk more than fifteen minutes, pain
5 at seventy degrees of flexion and with extension, limited
6 rotation and lateral bending and limited range of motion due to
7 pain, tenderness to palpation in the thoracic and lumbar spine
8 and at bilateral hips and inguinal and lateral hip, prescription
9 for muscle spasms]; A.R. 212 [December 2003, obesity contributing
10 to back pain and arthritis, encouraged to continue weight loss]).

11      This is a case that is essentially like <u>Orn v. Astrue</u>, 495
12 F.3d 625 (9th Cir. 2007), in which the opinion that was contrary
13 to the treating doctors' opinions and was relied on by the ALJ
14 did not set forth any alternative diagnosis and did not rest on
15 any results from significant objective tests that the treating
16 doctor had not considered. In effect, the state agency
17 physicians' opinions here are based on findings that are
18 consistent with Dr. Pistel's findings and diagnoses that are
19 consistent with Dr. Pistel's; the state agency doctors merely
20 came to different conclusions.

21      As to the ALJ's reasoning that Dr. Pistel's conclusions were
22 administrative, not medical, and were on issues reserved to the
23 Commissioner, it is established that a determination of whether
24 or not a claimant meets the statutory definition of disability is
25 a legal conclusion reserved to the Commissioner; the opinion of a
26 medical source on the ultimate issue of disability is not
27 conclusive. 20 C.F.R. §§ 404.1527(e)(1), 416.927(e)(1);
28 <u>Magallanes v. Bowen</u>, 881 F.2d 747, 751 (9th Cir. 1989). However,

1 Dr. Pistel did not conclude solely as to the ultimate issue of

2 disability; rather, he opined specifically as to Plaintiff's

3 capacity to sit, stand, walk, and perform work activity. The

4 record thus does not support the ALJ's assertion that no medical

5 opinions were stated by Dr. Pistel.

6    The opinions of Dr. Pistel were in the form of a letter to

7 whom it may concern, and a questionnaire (A.R. 311, 390); it thus

8 may be inferred that the purpose of rendering the opinions was

9 not merely to document activity in a file, but rather was to

10 advise someone other than Plaintiff of her condition. If by

11 characterizing Dr. Pistel's report as administrative the ALJ

12 meant to comment upon the purpose of the opinions, then the Court

13 notes that in the absence of other evidence to undermine the

14 credibility of a medical report, the purpose for which the report

15 was obtained does not provide a legitimate basis for rejecting

16 it. Reddick v. Chater, 157 F.3d 715, 726 (9th Cir. 1998).

17    The Court concludes that the ALJ failed to state specific

18 and legitimate reasons, supported by substantial evidence, to

19 give little weight to the opinion of Dr. Pistel. Dr. Pistel's

20 opinion was entitled to controlling weight.

21       B. Opinion of Dr. Gadgil

22    On February 23, 2006, Dr. Neetee Gadgil opined that

23 Plaintiff's hip pain and chronic lower back pain with radiation

24 in the bilateral lower extremities resulted in an ability to sit

25 at one time without rest or support for thirty minutes to one

26 hour, and stand and walk fifteen to twenty minutes; over an

27 eight-hour period, Plaintiff's total capacity for sitting was one

28 hour, and her capacity for standing or walking was fifteen to

twenty minutes. Further, she was unable to squat or lift her arms above her head, and she needed to change position constantly. Her condition precluded her from working at any full-time work at any exertional level, including sedentary work, from September 3, 2004, forward. (A.R. 391.) Plaintiff had to elevate her legs and lie down periodically for two hours to help with her back pain The opinion was based on Plaintiff's multiple surgeries for her hips secondary to slipped capital femoral epiphysis, and an MRI of August 2005 that showed a small disc bulge at L5-S1. (Id.)

Plaintiff argues that the ALJ's rejection of Dr. Gadgil's opinion was not supported by substantial evidence. The ALJ stated in pertinent part:

> I also give little weight to this assessment. The treatment records submitted by the claimant contain no reports that Dr. Gadgil ever formally assessed the claimant's condition.

(A.R. 35.)

A formal assessment, as referred to by the ALJ, is understood to refer to a recorded evaluation by the doctor in the doctor's official capacity. The record reflects that along with orthopedist Dr. Pistel, Dr. Gadgil was one of two listed physicians treating Plaintiff in August 2005 (A.R. 374) and was Plaintiff's primary care physician in September 2005 (A.R. 328-30). Further, it shows that as resident physician, Dr. Gadgil examined Plaintiff in February 2005 regarding her bilateral hip and leg pain. Dr. Gadgil reviewed Plaintiff's history, medications, and therapy; performed an examination and made findings concerning Plaintiff's decreased range of motion, ability to sit and squat, response to straight leg raising, and

gait; stated her impression; and prepared a treatment plan
involving instructions for home exercise, medication, physical
therapy. (A.R. 345-46.) Dr. Gadgil evaluated Plaintiff's symptoms
(including a precise anatomical description of the site of
Plaintiff's pain), condition, progress in physical therapy,
activity level, and medications in March 2005 when Plaintiff
returned to the pain clinic; Dr. Gadgil modified Plaintiff's
treatment plan and medications. (A.R. 344.)

The Court thus agrees with Plaintiff that because the record
clearly reflects formal assessments by Dr. Gadgil, the record
lacks substantial evidence to support the ALJ's reason for giving
little weight to the opinion of Dr. Gadgil.

IX. <u>Evidence from the Vocational Expert</u>

Plaintiff argues that because the hypothetical questions
propounded to the vocational expert (VE) omitted pertinent
limitations, the vocational testimony is inadequate to support
the ALJ's conclusions.

The Commissioner may carry its burden of showing ability to
do other work by eliciting the testimony of a vocational expert
(VE) in response to a hypothetical that sets out all the
limitations and restrictions of the claimant that are supported
by the record. <u>Andrews v. Shalala</u>, 53 F.3d 1035, 1044 (9th Cir.
1995). A hypothetical question posed to a vocational expert (VE)
must be based on medical assumptions supported by substantial
evidence that reflects all the claimant's limitations. <u>Osenbrock</u>
<u>v. Apfel</u>, 240 F.3d 1157, 1164-65 (9th Cir. 2001) (citing <u>Roberts</u>
<u>v. Shalala</u>, 66 F.3d at 184)). An ALJ may accept or reject
restrictions in a hypothetical question that are not supported by

1 substantial evidence. <u>Osenbrock</u>, 240 F.3d 1157, 1164-65. Reliance

2 on a hypothetical that fails to include all accepted limitations

3 is insufficient to carry the agency's burden of proving ability

4 to engage in alternative work. <u>Andrews v. Shalala</u>, 53 F.3d 1035,

5 1044 (9th Cir. 1995) (remanding case to the agency to determine

6 vocational ability based on a hypothetical that accurately

7 reflected mental RFC, including moderate limitations in ability

8 to understand, remember, and carry out detailed instructions, as

9 well as work with others without distraction, respond

10 appropriately to work changes, and set goals or plans

11 independently of others). Although a hypothetical should include

12 subjective complaints, it need not include complaints which were

13 validly rejected with a legally sufficient statement of reasons

14 supported in the record. <u>Light v. Social Security Administration</u>,

15 119 F.3d 789, 793 (9th Cir. 1997).

16       Here, the two hypothetical questions propounded to the VE

17 set forth a light work RFC with some postural and environmental

18 limitations, and a sedentary work RFC with limitations of two

19 hours of standing but unlimited sitting with some postural and

20 environmental limitations. Because the functional limitations

21 reflected by Plaintiff's subjective complaints, and the RFC set

22 forth by the treating physicians, were both lacking from the

23 hypothetical questions, the evidence of the VE is insufficient to

24 support the judgment.

25       X. <u>Remedy</u>

26       Here, the ALJ's findings concerning credibility and RFC were

27 not supported by legally adequate reasons that in turn were

28 supported by substantial evidence in the record.

A district court is authorized to affirm, modify, or reverse a decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing. 42 U.S.C. § 405(g). The decision whether to remand a matter pursuant to sentence four of § 405(g) or to order immediate payment of benefits is within the discretion of the district court. <u>Harman v. Apfel</u>, 211 F.3d 1172, 1178 (9th Cir. 2000). Where the Commissioner has failed to provide adequate reasons for rejecting the opinion of a treating or examining physician, a reviewing court generally credits them as a matter of law. <u>Lester v. Chater</u>, 81 F.3d 821, 834 (9th Cir. 1995). An immediate award of benefits should be directed where 1) the ALJ has failed to provide legally sufficient reasons for rejecting the opinions, 2) there are no outstanding issues that must be resolved before a determination of disability can be made, and 3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited. <u>Smolen v. Chater</u>, 80 F.3d 1273, 1292 (9th Cir. 1996). Further, where the ALJ failed to provide legally sufficient reasons for rejecting the claimant's testimony and her treating physicians' opinions, the evidence is credited as true. <u>Harman</u>, 211 F.3d at 1179. If there are no outstanding issues that must be resolved before a determination of disability can be made, and where it is clear from the record that the ALJ would be required to find the claimant disabled if the evidence were credited, then remand for an award of benefits is appropriate. <u>Id.</u> at 1178. In these circumstances, the record has bene fully developed, and further administrative proceedings would serve no useful purpose. <u>Benecke v. Barnhart</u>, 379 F.3d 587, 593-96 (9th Cir. 2004).

1    XI. <u>Recommendation</u>

2    Accordingly, here, upon remand, Plaintiff's subjective

3    complaints and the RFC assessments of Plaintiff's treating

4    physicians must be credited as true; to permit any

5    reconsideration of this evidence would be unfair to Plaintiff and

6    would serve no valid administrative purpose.

7    Accordingly, it IS RECOMMENDED that the matter be remanded,

8    and that the only issues to be addressed upon remand are 1) any

9    specific arguments to be raised by Plaintiff concerning whether

10   or not her severe impairments met or medically equal a listed

11   impairment, and 2) whether given Plaintiff's RFC as reflected by

12   her subjective claims and the RFC assessed by her treating

13   physicians, Plaintiff can perform any other work existing in

14   sufficient numbers in the economy (step five), and, if not, when

15   her disability commenced.

16   This report and recommendation is submitted to the United

17   States District Court Judge assigned to the case, pursuant to the

18   provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 72-304 of the

19   Local Rules of Practice for the United States District Court,

20   Eastern District of California. Within thirty (30) days after

21   being served with a copy, any party may file written objections

22   with the court and serve a copy on all parties. Such a document

23   should be captioned "Objections to Magistrate Judge's Findings

24   and Recommendations." Replies to the objections shall be served

25   and filed within ten (10) <u>court</u> days (plus three days if served

26   by mail) after service of the objections. The Court will then

27   review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636

28   (b)(1)(C). The parties are advised that failure to file

1  objections within the specified time may waive the right to

2  appeal the District Court's order. <u>Martinez v. Ylst</u>, 951 F.2d

3  1153 (9th Cir. 1991).

4

5  IT IS SO ORDERED.

6  **Dated:    August 28, 2008**                      **/s/ Sandra M. Snyder**
                                           UNITED STATES MAGISTRATE JUDGE

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28